Whitaker, Judge,
dissenting:
I cannot agree with the opinion of the majority. It seems to me that it treats the vessels sold as the “standard” Liberty-type vessel for the purpose of ascertaining the statutory sales price, and then treats it, not as a standard vessel, but as a special sort of vessel for determining the adjustments necessary to put the vessel “in class.”
The Ship Sales Act of 1946 (60 Stat. 41) was passed for the purpose of fixing a uniform basic price for the sale of all vessels of the Maritime Commission which were of the same type. This statutory sales price was based on the prewar domestic cost of a “standard vessel” (section 3 (c)). The statutory sales price was to be 50 percent of the prewar domestic cost of a dry-cargo vessel, but 87% percent of the prewar domestic cost of a tanker. However, it was provided in the last paragraph of section 3 (d) (4) that “for the pur *574 poses of this Act, * * * all Liberty vessels shall be considered to be vessels of one and the same type.” The vessels sold to plaintiffs were Liberty-type tankers.
In section 299.1 of General Order No. 60 of the Maritime Commission it was provided in subsection (f) that the “ ‘statutory sales price,’ as applied to a particular vessel, means, in the case of a dry-cargo vessel (as defined in paragraph (c) of this section), an amount equal to 50% of the prewar domestic cost of that type of vessel.” Within this definition of a dry-cargo Liberty vessel comes a Liberty-type tanker, because in subparagraph (c) of that section it is provided that “the term ‘dry-cargo vessel’ includes a Liberty-type tanker * *
As the Court found in finding 13, the “ ‘standard’ Liberty-type vessel was the basic Liberty-type, dry-cargo vessel,” and the prewar domestic cost of all Liberty-type vessels “was made without considering the cost of any of the modified Liberty-type vessels.” The Court also found in finding 14:
The Liberty-type vessels, converted to emergency tankers, cost more to build than the basic Liberty-type, dry-cargo vessel, their average cost being $1,995,000. The five tankers built in 1944 each cost $2,056,525. Their estimated prewar domestic price was $1,518,000 each. This extra cost was not reflected in any of the prices published in General Order No. 60. The Commission chose the basic Liberty-type, dry-cargo vessel as the “standard” vessel for all Liberty-type vessels and offered the modified vessels, as well as the basic Liberty-type, dry-cargo vessels, for sale at prices estimated and determined on the basis of the cost of the “standard” Liberty-type, dry-cargo vessel.
«í* íjí
On the basis of this provision and the fact that there were over 2,500 Liberty-type, dry-cargo vessels, and 62 tankers, only 5 of the latter being delivered in 1944, and which could have been used in the cost base, the Commission (1) chose the Liberty-type, dry-cargo vessel as the “standard” vessel, (2) determined the statutory sales price for all designs on the basis of the cost of this “standard” vessel, (3) defined the Liberty-type tanker *575 as a dry-cargo vessel in General Order 60, (4) sold all designs at these prices, and (5) made no determinations, insofar as the sale of the modified designs was concerned, that the tanker equipment on the tankers constituted “desirable features” under Section 3 (d) (3) of the Act.
Accordingly, the “statutory sales price” of the vessels sold to plaintiffs, although tankers, was fixed upon the basis of the prewar domestic cost of a dry-cargo Liberty-type vessel. That it was a tanker and cost more to construct than a dry-cargo vessel was disregarded; it was treated as a dry-cargo vessel.
The Ship Sales Act in section 3 (d) (1) provides that from the “statutory sales price” there shall be deducted the cost of putting the vessel “in class.” The Act contemplated that the vessels should be sold on the basis of the cost of a standard vessel, and, hence, if the vessel actually sold was not in condition to pass inspection, which is to say, was not “in class,” the cost of putting it “in class” was to be deducted from the price. But, since the sales price was fixed as if the vessel was a dry-cargo vessel, then the cost to be deducted was the cost of putting it “in class” as a dry-cargo vessel.
What the plaintiffs are suing for in this case is the cost of fireproofing the vessels sold plaintiffs. Hence, the question is, was this fireproofing necessary in order to put a standard Liberty-type vessel “in class.” As stated, a standard Liberty vessel was a dry-cargo vessel; it was not necessary to fireproof such a vessel in order to put it “in class.” Fireproofing was necessary only where the vessel was used as a tanker. Therefore, since the statutory sales price was not based on the prewar domestic cost of a tanker, but was based on the prewar domestic cost of a dry-cargo vessel, plaintiffs are not entitled to the cost of fireproofing, because this was not necessary to put a dry-cargo vessel “in class.”
It is incongruous to treat this vessel as a dry-cargo vessel for determining the statutory sales price and to treat it as something different for the purpose of determining what was necessary to be done to put it “in class.” Since it was not necessary to fireproof it to put it “in class” as a standard *576 dry-cargo vessel, the plaintiffs, in my opinion, are not entitled to this cost.
Littleton, Judge, joins in the above dissent.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Marion T. Bennett, and the briefs and arguments of counsel, as follows:
FINDINGS OF GENERAL APPLICATION TO ALL THREE CASES
1. The plaintiffs, Southeastern Oil Delaware, Inc., hereinafter referred to as “Southeastern,” and Paco Tankers, Inc., hereinafter referred to as “Paco,” are and at all times hereinafter mentioned were corporations organized and existing under the laws of the State of Delaware, the former having its principal office and place of business in Jacksonville, Florida, and the latter in Philadelphia, Pennsylvania.
2. At the outset of World War II, the United States was faced with the necessity of obtaining sufficient shipping capacity to insure adequate life lines of supply to American forces abroad and to its allies. The task of supplying the vessels to meet this emergency was given to the United States Maritime Commission, hereinafter referred to as the “Commission,” acting in conjunction with the War Shipping Administration.
Early in 1942 the Commission adopted plans and specifications for the construction of a single-screw, 10,000-ton, dry-cargo vessel which was given the Commission designation EC2-S-C1 and which subsequently acquired the popular designation of “Liberty” vessel. The specifications for this vessel depicted one suitable for emergency production and operation, the prime consideration being that its simple design made it suitable for mass-production methods of construction necessary to insure delivery of sufficient vessels to meet the expanding needs resulting from the war.
3. During 1942 and 1943 an ever-increasing number of Liberty-type, dry-cargo vessels were delivered to the Commission. Early in 1943 the shortage of tankers became critical and to meet this need the Commission modified the basic plans and specifications of the Liberty-type vessel to *577 permit the transportation of petroleum products in bulk in some of these vessels.
The converted Liberty-type vessel was given the Commission designation Z-ET1-S-C3. The specifications covering the modifications contained the following:
Section I — general provisions 1. General
This specification and the accompanying plans describe the principal changes in Design EC2-S-C1 vessels, as currently being built for carrying cargo, to fit it for the carrying of combustible liquids having a flash point above 150° F. Coast Guard Grade “E.” The changes from the cargo ship should be kept to a minimum.
Specifications for Design EC2-S-C1, cargo ship, including all authorized changes, hereinafter termed “Base” Specifications shall be a part hereof, excepting as modified herein, or necessary to accomplish the intent herein expressed.
* # # % *
3. Intent of specifications
It is the intent of this specification that the contractor shall deliver to the Commission a ship in accordance with all provisions of plans and specifications and current revisions thereof, of Design EC2-S-C1, cargo ship, except that it shall be ready for service as a bulk oil carrier for the grades of oil specified herein, in lieu of general cargo.
It is evident that it is not practicable to enumerate all changes, additions, etc. that are necessary to accomplish this purpose, nor is it necessary to do so, it being understood by the Contractor that the above declaration of intent and such information as is contained herein, are sufficient and all inclusive.
4. Before a merchant vessel of American registry may operate, the plans and specifications for its construction must be examined and approved by the United States Coast Guard. In regard to the modification of the Liberty-type, dry-cargo vessel, Commissioner Vickery wrote to the Commandant of the Coast Guard the following letter, dated December 28, 1942:
Subject: EC2 Cargo Vessels.
The Maritime Commission is considering the conversion of a certain number of EC2 cargo vessels for the *578 carriage of Grade E oils in bulk. These conversions will be assigned to several shipyards depending on conditions suitable for the work involved.
The Maritime Commission has made preliminary studies for these conversions and in connection thereto is developing arrangement and structural plans for the consideration and approval of the American Bureau of Shipping.
It is the intention of the Commission to comply with existing regulations insofar as possible, but to accept a restricted classification as a means of accomplishing these conversions with the speed required by the present emergency. The Commission, therefore, proposes to introduce no modifications in the accommodations existing in the EC2 cargo vessels used for conversion to bulk oil carriers and to use material as available in these spaces in line with your approval already granted for the EC2 cargo ships.
We will submit to your office for your consideration arrangement plans and other data as approved by the American Bureau of Shipping. Meanwhile, it is desired that requirements for fire-resistive construction in way of living quarters, for the subject conversion, be waived and that the Commission be advised accordingly.
Your prompt consideration will be appreciated.
5. In response thereto, the Assistant Commandant replied on January 4, 1943, as follows:
Subject: EC2-S-C1 Cargo Vessels, Conversion to Tank Ships.
It is noted from reference (a) that you are considering the conversion of a certain number of the subject vessels for the carriage of Grade E liquids in bulk and that you desire to make this conversion without introducing any modifications of the construction of the accommodations as at present approved for the EC2 cargo ships.
The existing construction referred to involves the use of plywood and does not comply with the requirement of the Buies for Tank Vessels that partitions and sheathing in the living quarters be of approved fire-resistive construction. However, as requested by you, this office will approve this type of construction for the duration of the present national emergency with the understanding that at the termination of this emergency these vessels will either be converted for dry cargo service or all necessary alterations will be made to secure strict compliance with the Buies for Tank Vessels.
*579 It is noted that plans indicating the revised arrangement and the piping, venting, etc. will be submitted for approval as soon as they are developed. It is requested that this office be advised as to which yards will make these conversions and that sufficient plans be submitted for the information of the Merchant Marine Inspectors involved.
6. Subsequently, the Commission furnished the Coast Guard with copies of the plans and specifications for the Z-ET1-S-C3 design, and on March 5,1943, pursuant to the letter of January 4, 1943, as set out above in finding 5, the Coast Guard approved these plans and specifications for the construction of the modified Liberty-type vessels with certain exceptions not pertinent to the issues presented in these claims.
Subsequently, on June 19, 1943, Commissioner Vickery wrote the Commandant of the Coast Guard the following letter:
Subject: MC Design Z-ET1-S-C3, Partial Conversion to Tankei’s.
The Maritime Commission has been informed by the Tanker Section of the War Shipping Administration that there is an acute shortage of vessels suitable for the transport of gasoline. The original intent of the subject conversion was to provide for additional heavy oil carriers but it appears that this phase of transport will not be critical in the near future. Therefore, it is desired to modify as many as possible of the above conversions for carrying gasoline and other light oil products.
In order to meet the urgent demands for tonnage, modifications must be kept to a minimum and, therefore, changes will be limited to fitting only the forward portion of the vessel for this purpose. In order to comply with the present requirements, it is proposed to change the venting arrangement for the forward tanks to that z'equired by law, as well as to install a cofferdam separating the cargo tank and chain locker.
Due to the difficulty of procurement in time not to interfere with building scliedules it does not appear possible to introduce changes in joiner bulkheads or furniture to comply with the rigid tanker requirements for fireproof material for these items.
*580 Due to the fact that these vessels are of Urgent military need your approval is requested for certification of these vessels as oil carriers fitted for the transport of heavy oil in the after portion and either light or heavy oil in the forward portion of the vessel under the general provisions as outlined in the previous paragraph.
7. Commissioner Vickery’s letter was answered on June 80,1943, by the Commandant, as follows:[1]
Subj: MC Design Z-ET1-S-C3, Partial Conversion to Tankers.
In response to the request contained in your letter of 19 June, 1943, finding is hereby made waiving the provisions of Sections 32.2-1 and 32.2-5 of Subchapter D, Eules Governing Tank Vessels, permitting the use of materials other than those of approved fire-resistive quality for sheathing, partitions, bulkheads and furniture in officers’ and crew accommodations on the subject vessels now scheduled for conversion at the California Shipbuilding Corporation and the Delta Shipbuilding Co., Inc.
This finding for waiver is made under the authority of the Order of the Secretary of the Navy and the provisions of Navigation and Vessel Inspection Circular No. 20, and is based upon your advice that the subject vessels are urgently needed for the successful prosecution of the war for the transportation of inflammable liquids in the forward compartments and combustible liquids in the after compartments.
8. The action taken by the Commandant of the Coast Guard, as evidenced by the letter of June 30, 1943, and set forth above in finding 7, was pursuant to authority granted him by the Acting Secretary of the Navy on October 1,1942, as set forth in the Federal Eegister:
Vessels Engaged in Business Connected With the Conduct of the War
order revoking previous orders, etc.
Eevoking orders, dated 6 March 1942, and substituting therefor an order waiving compliance with the provisions of the Navigation and Vessel Inspection laws, *581 administered by the United States Coast Guard to the extent and in the manner that the Commandant of the United States Coast Guard shall find to be necessary in the conduct of the war.
The orders of the Secretary of the Navy (F. E. Doc. 42 — 2742 and 2748) dated 6 March 1942, published in the Federal Eegister 31 March 1942 (7 F. E. 2477) are hereby revoked and the following is substituted therefor:
By virtue of the authority vested in me by the provisions of section 501 of the Second War Powers Act, 1942 (Public Law 507, 77th Congress, 2d Session), I hereby waive compliance with the Navigation and Vessel Inspection laws administered by the United States Coast Guard, in the case of any vessel engaged in business connected with the conduct of the war, to the extent and in the manner that the Commandant, United States Coast Guard, shall find to be necessary in the conduct of the war.
James Fokrestal, Acting Secretary of the Ñavy.
9. Section 501 of the Second War Powers Act, 1942 (Public Law 507, 77th Congress, 56 Stat. 176, 180), referred to above, provided:
The head of each department or agency responsible for the administration of the navigation and vessel inspection laws is directed to waive compliance with such laws upon the request of the Secretary of Navy or the Secretary of War to the extent deemed necessary in the conduct of the War by the officer making the request. The head of such department or agency is authorized to waive compliance with such laws to such extent and in such manner and upon such terms as he may prescribe either upon his own initiative or upon the written recommendation of the head of any other Government agency whenever he deems that such action is necessary in the conduct of the war.
10. During 1943 and 1944 sixty-two of the so-called Liberty-type tankers were constructed by the Delta Shipbuilding Company, Inc., New Orleans, Louisiana, and by the California Shipbuilding Corporation, Los Angeles, California. At the time of the approval of the plans and specifications for these vessels in March 1943, Coast Guard Headquarters had so advised the District Offices of the *582 Coast Guard having jurisdiction over these two ports. As the vessels were completed, and each year thereafter as they became due for annual inspection, they were examined by Coast Guard inspectors and issued certificates of inspection permitting them to sail.
These Liberty-type tankers were operated by general agents of the Commission during the war and for a period subsequent thereto. Among these general agents was Keystone Shipping Company, the operating affiliate of plaintiff Paco. Southeastern Oil Company, Inc., the parent company of plaintiff Southeastern, operated several Liberty-type tankers under charter from the Commission. As a result thereof, plaintiffs were well acquainted with this type of vessel before they bought the ships here involved.
11. On March 8,1946, the President approved the Merchant Ship Sales Act of 1946 (Public Law 321, 79th Congress, 60 Stat. 41) the basic purpose of which was the orderly disposal of the surplus merchant vessels acquired by the United States during World War II. Among the vessels subject to sale under the provisions of the Ship Sales Act there were over 2,500 dry-cargo Liberty-type vessels, 24 Liberty-type “colliers,” and the 62 Liberty-type “tankers.” This statute provided in part as follows:
Sec. 3. As used in this Act the term — * * *
(c) “Prewar domestic cost,” as applied to any type of vessel, means the amount determined by the Commission, and published by the Commission in the Federal Register, to be the amount for which a standard vessel of such type could have been constructed (without its national defense features) in the United States under normal conditions relating to labor, materials, and other elements of cost, obtaining on or about January 1,1941. In no case shall the prewar domestic cost of any type of vessel be considered to be greater than 80 per centum of the domestic war cost of vessels of the same type.
(d) “Statutory sales price,” as applied to a particular vessel, means, in the case of a dry-cargo vessel, an amount equal to 50 per centum of the prewar domestic cost of that type of vessel, and in the case of a tanker, such term means an amount equal to 87^ per centum of the prewar domestic cost of a tanker of that type, such amount in each case being adjusted as follows:
*583 (1) If the Commission is of the opinion that the vessel is not in class, there shall be subtracted the amount estimated by the Commission as the cost of putting the vessel in class.
(2) If the Commission is of the opinion the vessel lacks desirable features which are incorporated in the standard vessel used for the purpose of determining prewar domestic cost, and that the statutory sales price (unadjusted) would be lower if the standard vessel had also lacked such features, there shall be subtracted the amount estimated by the Commission as the amount of such resulting difference in statutory sales price.
(3) If the Commission is of the opinion that the vessel contains desirable features which are not incorporated in the standard vessel used for the purpose of determining prewar domestic cost, and that the statutory sales price (unadjusted) would be higher if the standard vessel had also contained such features, there shall be added the amount estimated by the Commission as the amount of such resulting difference in statutory sales price.
(4) There shall be subtracted, as representing normal depreciation, an amount computed by applying to the statutory sales price (determined without regard to this paragraph) the rate of 5 per centum per annum for the period beginning with the date of the original delivery of the vessel by its builder and ending with the date of sale or charter to the applicant in question, and there shall also be subtracted an amount computed by applying to the statutory sales price (determined without regard to this paragraph) such rate not in excess of 3 per centum per annum in the case of a vessel other than a tanker, and not in excess of 4 per centum per annum in the case of a tanker, for such period or periods of war service as the Commission determines will make reasonable allowance for excessive wear and tear by reason of war service which cannot be or has not been otherwise compensated for under this subsection.
No adjustment, except in respect of passenger vessels constructed before January 1, 1941, shall be made under this Act which will result in a statutory sales price which (1) in the case of dry-cargo vessels (except Liberty-type vessels) will be less than 35 per centum of the domestic war cost of vessels of the same type, (2) in the case of any Liberty-type vessel will be less than 3iy2 per centum of the domestic war cost of vessels of such type, or (3) in the case of a tanker will be less than 50 per centum of the domestic war cost of tankers of the *584 same type. For the purposes of this Act, except section 5, all Liberty vessels shall be considered to be vessels of one and the same type.
(e) “Domestic war cost” as applied to any type of vessel means the average construction cost (without national defense features) as determined by the Commission, of vessels of such type delivered during the calendar year 1944, except in case of any type of vessel the principal deliveries of which were made after the calendar year 1944, there shall be used in lieu of such year 1944 such period of not less than six consecutive calendar months as the Commission shall find to be most representative of war production costs of such type.
12. On April 23,1946, the Commission published its rules and regulations governing the sale of vessels pursuant to provisions of the Ship Sales Act. These rules and regulations, known as Maritime Commission General Order No. 60 provided in part:
The Merchant Ship Sales Act of 1946 having been enacted on March 8, 1946, and the prewar domestic cost of vessels covered thereby being published in this issue of the Federal Register pursuant to such Act, in section 299.56 below, the Maritime Commission hereby invites applications under the provisions of the Act and the following regulations. Subject to such provisions, the Maritime Commission will accept applications for the purchase or charter of vessels now under the jurisdiction and control of the Maritime Commission or War Shipping Administration. * * *

Prices for standard Maritime Commission vessels in accordance with the Merchant Ship Sales Act of 1946

Type vessel Estimated cost as of Jan. 1,1941 Domestic war cost Statutory sales price (unadjusted) Price floor Dry cargo Ol-MT-BXJl...... E02-S-01 (Liberty). Tankers T2-SE-A1 (UK)_____ $1,063,000 1.278.000 2.316.000 $1,396,813 1,728,590 3,010,703 60% mi cosí $531,500 639,000 87M%micost 2,026,500 85% war cost $488,885 S1H% war cost 544,506 50% war cost 1,505,352
*585 ORGANIZATION OF GENERAL ORDER 60
There are printed herein the regulations of the United States Maritime Commission for administration of the Merchant Ship Sales Act of 1946, and copies of certain necessary applications and forms.
The regulations and forms are organized and written so that a person interested in one particular phase of the Act can acquire all necessary information from the pertinent subpart of the regulations and the applicable form.
General provisions and definitions at the beginning of the regulations should be consulted by all interested persons.
* S& # ‡ *
SUBPART A GENERAL PROVISIONS
299.1 Definitions. — For the purpose of these regulations (§§ 299.1 to 299.91, inclusive),
# %
(c) Dry-cargo vessel. — “Dry-cargo vessel” means, except where the context indicates otherwise, any vessel other than a tanker, but the term “dry-cargo vessel” includes a Liberty-type tanker except for Section 299.31 of the regulations.
*****
(f) Statutory sales price. — “Statutory sales price,” as applied to a particular vessel, means, in the case of a dry-cargo vessel (as defined in paragraph (c) of this section), an amount equal to 50% of the prewar domestic cost of that type of vessel, and in the case of a tanker (excluding Liberty tankers), such term means an amount equal to 87%% of the prewar domestic cost of a tanker of that type, such amount in each case being adjusted as follows:
* $ * $ ‡
No adjustment, except in respect of passenger vessels constructed before 'January 1,1941, shall be made under the Act which will result in a statutory sales price which (1) in the case of any Liberty-type vessel will be less than 31%% of the domestic war cost of vessels of such type, (2) in the case of dry-cargo vessels (except Liberty-type vessels) will be less than 35% of the domestic war cost of vessels of the same type, or (3) in the case of *586 a tanker (except a Liberty tanker) will be less than 50% of the domestic war cost of tankers of the same type.
íjc fjí íjC ^
General Order 60, Supplement 3, provided in part as follows:
The following designs are subtypes of standard types listed above. The prices of each subtype may be adjusted above or below published prices for types of which they are subtypes, depending upon whether such subtypes possess desirable features which are not incorporated in the standard vessel, or lack desirable features which are incorporated in the standard vessel. The adjusted prices of such subtypes will be quoted upon written inquiry to the Commission.
Subtype published April 23, 1946: Standard type
C1-S-AY1------------------------------------ Cl
*Z-EC2-S-C2_________________________________ EC2
*EC2-S-AW1_________________________________ E02
*Z-EC2-S-C5_________________________________ EC2
*Z-ETl-S-03_________________________________ EC2
* Canadian Liberty_____________________________ EC2
*****
•Prices identical with those of standard EC2.
(e) Type EG2 (Liberty). — The standard Liberty cargo vessel is a steel, full scantling vessel with a raked stem and a cruiser stern. Deep tanks are installed in No. 1 and No. 4 holds. The propelling machinery is located amidships.
The EC2-S-C1 is considered to be the standard design of the Liberty type vessels. The modified designs are the Z-EC2-S-C5, the Z-ET1-S-C3, and the EC2-SAWl. (Principal characteristics and prices for these types were published in the Federal Eegister of April 23, 1946.)
In addition, and not hitherto published, there is the Z-EC2-S-C2, a tank carrier, which has basic features similar to the modified Z-EC2-S-C5 design, and the Canadian Liberty ship, which is similar to the EC2S-Cl, but is coal-fired rather than oil-fired.
The principal design characteristics of the standard vessel and of the modified designs are listed below:
*587 Design Standard EC2-S-C1, full scantling Modified Z-EC2-S-C5, boxed airplane tr. Modified Z-ET1-8-C3, tanker Modified EC2-S-AW1, Collier Length over-all______ Beam molded________ Depth molded. — .___ Load draft molded... Deadweight tons_____ Gross tons___________ Net tons_____________ Bale cubic capacity. Barrel capacity.— Propulsion___________ Indicated h. p...... Speed, knots________ 441'6" 56'10£i" 37'4" 27'$" 10,800 7,170 4,380 500,000 441'6" 56'10?4" 37'4" 27'8" 10,600 7,200 4,300 490,000 i Steam recip. 2,500 11 1 Steam recip 2,500 11 441/6" 56'10M" 37'4" 27'8" 10,800 7,243 4,384 65,000 i Steam recip 2,500 11 441/6" 56'1054" 37'4" 28'7" 11,040 6,640 3,740 472,800 2 Steam recip. 2,500 11 1 Located amidship. * Located aft.
The prices of the EOT vessels, which under the terms of the act shall be the same for all designs, are as follows:
Prewar domestic cost Domestic war cost Unadjusted statutory sales price Floor price $1,278,000.. $1,728,590 $639,000 $544,506
13. The prewar domestic cost of $1,278,000, referred to in General Order No. 60, as set forth in finding 12 and applicable to the sale of “all designs,” was the estimate made by the Maritime Commission of the cost of a “standard” Liberty-type vessel as of January 1, 1941. This “standard” Liberty-type vessel was the basic Liberty-type, dry-cargo vessel, and this estimate was made without considering the cost of any of the modified Liberty-type vessels.
The domestic war cost of $1,728,590, referred to in General Order No. 60, supra, was the average of the audited shipyard costs of the 712 Liberty-type, dry-cargo vessels delivered to the Commission during 1944, adjusted as follows:
Average construction cost of (712) EC2’s built in
1944____________________________________________$1,715,601
Less cost of National Defense features-------------- 60,000
1,655, 601
Plus facilities expense---------------------------- 66,863
Plus administrative allowance--------------------- 6,126
Published average war cost__________________ 1,728,590
*588 14. The Liberty-type vessels, converted to emergency tankers, cost more to build than the basic Liberty-type, dry-cargo vessel, their average cost being $1,995,000. The five tankers built in 1944 each cost $2,056,525. Their estimated prewar domestic price was $1,518,000 each. This extra cost was not reflected in any of the prices published in General Order No. 60. The Commission chose the basic Liberty-type, dry-cargo vessel as the “standard” vessel for all Liberty-type vessels and offered the modified vessels, as well as the basic Liberty-type, dry-cargo vessels, for sale at prices estimated and determined on the basis of the cost of the “standard” Liberty-type, dry-cargo vessel.
The reason the Commission used the cost of the Liberty-type, dry-cargo vessel, and the prices computed on the basis thereof, in lieu of setting up a “standard” vessel for the emergency tanker, as well as for the dry-cargo vessel, was the provision in the last paragraph of Section 3 (cl) of the Ship Sales Act, which stated:
* * * For the purposes of this Act, except section 5, all Liberty vessels shall be considered to be vessels of one and the same type.
On the basis of this provision and the fact that there were over 2500 Liberty-type, dry-cargo vessels and 62 tankers, only 5 of the latter being delivered in 1944, and which could have been used in the cost base, the Commission (1) chose the Liberty-type, dry-cargo vessel as the “standard” vessel, (2) determined the statutory sales price for all designs on the basis of the cost of this “standard” vessel, (3) defined the Liberty-type tanker as a dry-cargo vessel in General Order 60, (4) sold all designs at these prices, and (5) made no determinations, insofar as the sale of the modified designs was concerned, that the tanker equipment on the tankers constituted “desirable features” under Section 3 (d) (3) of the Act.
15. Notwithstanding the foregoing, the six vessels in these actions, were purchased by the the plaintiffs as tankers. The Commission was guided by the regulations, other than the fireproofing requirements, of the Coast Guard and the American Bureau of Shipping applicable to tankers on the vessels *589 subject to these actions. Many items which were class requirements for tankers only were included in the allowance granted by the Commission. Examples of this are repairs, alterations, rearrangement of cargo pumps, pump-rooms and cargo tanks, and the testing of heating coils in the cargo tanks and cargo lines.
16. The Coast Guard promulgated separate rules for the certification of tank vessels. The Barrett, Pendleton, Thompson, Ellsworth, Cleveland and Sholes, involved in these actions, have been treated by the Coast Guard as tankers and classed by the American Bureau of Shipping as tankers.
17. The Ship Sales Act, as originally enacted, gave the Commission authority to perform work on vessels to be sold. Section 12 (a) of the Ship Sales Act provides:
The Commission is authorized to reconvert or restore for normal operation in commercial services, including removal of national defense or war-service features, any vessel authorized to be sold or chartered under this Act. The Commission is authorized to make such replacements, alterations, or modifications with respect to any vessel authorized to be sold or chartered under this Act, and to install therein such special features, as may be necessary or advisable to make such vessel suitable for commercial operation on trade routes or services or comparable as to commercial utility to other such vessels for the same general type.
General Order No. 60, pursuant to this authority, contains the following provisions:
299.7 Reconversion, alteration or modification. — (a) Any person applying to purchase or charter under the regulations may attach to his application an application in substantially the form provided in Section 299.91. that the Commission reconvert or restore the vessel(s) for normal operation in commercial services, including the removal of national defense or war service features. Any such request shall include such detailed information as is necessary to advise the Commission fully of the work required.
(b) Any person applying to purchase or charter a war-built vessel under the regulations may attach to this application an application substantially in the form provided in Section 299.91, that the Commission make *590 replacements, alterations, or modifications with respect to the vessels applied for or install therein such special features as may be necessary or advisable to make such vessel suitable for commercial operation on trade routes or services or comparable as to commercial utility to other vessels of the same general type. Any such request shall include such detailed information as is necessary to advise the Commission fully of the work required.
(c) In approving or disapproving applications under paragraph (a) or (b) above, the Commission will consider, among other relevant factors,
(1) the availability of other suitable vessels for sale or charter to the applicant;
(2) whether such reconversion, restoration, replacement, alteration or modification is essential in order to dispose of the vessel under the provisions of the Act;
(3) whether such reconversion, restoration, replacement, alteration or modification could be effected under any other provisions of law; and
(4) whether such reconversion, restoration, replacement, alteration or modification is essential to the foreign or domestic commerce of the United States and would otherwise effectuate the policy and purposes of the Act.
(d) Restoration or installation of special features, unless such features are on the standard vessel, must, under the Act, be considered as added desirable features and, therefore, will require an adjustment in the statutory sales price of the vessel.
18. Under the Ship Sales Act, as originally enacted, when the sales contracts so provided, the Commission also used the authority granted by Section 12 (a) to perform the work necessary to place vessels to be sold “in class”, in lieu of granting “class” allowances to purchasers under Section 3 (d) of the Act.
The Commission’s policy with regard to classification, adopted on June 24, 1946, was:
1. Glassification. — If the vessel is sold “as is”, the Commission will grant an allowance within the limits of Section 3 (d) of the Merchant Ship Sales Act of 1946 for putting the vessel “in class.” If the vessel is sold under terms requiring delivery of the vessel “in class,” the Commission will deliver the vessel with valid certificates of inspection and classification. * * *
*591 3. Certification by U. S. Coast Guard, Marine Inspection. — Unless the vessel is sold “as is,” the Commission will deliver vessels to purchasers with appropriate certification by the Coast Guard, subject to the limitation of Paragraph 1 above, such cost being an expenditure by the Commission under Section 12 of the Act as a restoration of the vessel for normal commercial operation.
19. No Liberty-type tankers were sold under the provisions of the Ship Sales Act as originally enacted. All sales of these vessels occurred subsequent to the enactment of the Independent Offices Appropriation Act of 1948, 61 Stat. 585, 603, approved July 30, 1947. Congress, by the passage of this Act, took away the funds which had previously been used by the Commission to perform the work authorized by Section 12 (a) of the Ship Sales Act and also added the following proviso thereto:
Provided, That the Commission may make allowances to purchasers of vessels for the cost of putting vessels in class, such allowances to be determined on the basis of competitive bids, without regard to the provisions of the last paragraph of section 3 (d) of the Merchant Ship Sales Act of 1946.
20. Thereafter, plaintiffs, among others, made application to the Maritime Commission for the purchase of Liberty-type tankers. Paco made application on November 7, 1947, and this application, together with amendments thereto, reflected the intention of Paco to use the vessels purchased for general tanker trade, including transportation of molasses and petroleum. Southeastern Oil, Inc., parent company of plaintiff Southeastern, made application on October 29,1947, and this application, together with amendments thereto, reflected the intention of Southeastern Oil, Inc., to use the vessels purchased in the tanker trade. By subsequent agreement the vessels allocated to Southeastern Oil Company, Inc., were sold to plaintiff Southeastern, a subsidiary.
The following statement appeared in the Paco and Southeastern applications:
The undersigned hereby offers to purchase the war-built vessels hereinafter described (herein called the “war-built vessels”) at the statutory sales price, in accordance with the provisions of the Merchant Ship Sales Act of 1946, Public Law 321, 79th Congress, 2d *592 Session, approved March 8, 1946 (herein called the “act”), and the rules and regulations prescribed by the United States Maritime Commission (herein called the “Commission”), Sections 299.1 to 299.91, inclusive, of General Order 60, published in the Federal Register April 23, 1946 (herein called the “regulations”), which the applicant agrees shall be binding in all transactions in connection with this application. * * *
Among the rules and regulations prescribed by the United States Maritime Commission, referred to above, were the excerpts from General Order 60 previously set forth in findings 12 and 17.
21. Thereafter, the Commission approved these applications and allocated Paco two Liberty-type tankers, the S.S. William E. Pendleton, hereinafter referred to as the Pendleton, and the S.S. Oscar F. Barrett, hereinafter referred to as the Barrett, and allocated Southeastern two vessels, the S.S. Henry L. Ellsworth, hereinafter referred to as the Ellsworth, and the S.S. Jacob Thompson, hereinafter referred to as the Thompson, and later the S.S. Christopher L. Sholes, hereinafter referred to as the Sholes, and the S. S. Richard J. Cleveland, hereinafter referred to as the Cleveland.
Pursuant to the allocations, Paco signed Contract No. MCc-60831 on December 16, 1947, covering the purchase of the Pendleton and the Barrett.
On February 3, 1948, Southeastern signed Contract No. MCc — 60909 covering the purchase of the Ellsworth and the Thompson, and on February 26, 1948, Southeastern signed Contract No. MCc-61076 covering the purchase of the Cleveland and the Sholes. The contract used in all of these sales contained, among others, the following provisions:
Whereas:
1. Pursuant to the provisions of the Merchant Ship Sales Act of 1946, Public Law 321, 79th Congress, 2d Session, approved March 8, 1946 (herein called the “Act”), and the Rules and Regulations prescribed by the Commission in General Order 60, published in the Federal Register, Volume 11, No. 79, April 23, 1946, as heretofore or hereafter supplemented or amended (herein called the “Regulations”), the Buyer has heretofore filed an application with the Commission under Section 4 of the Act to purchase the war-built vessel(s)
*593 (herein referred to as the “vessel (s)”) named in Exhibit “A” attached hereto and forming a part hereof; and
2. The Commission has agreed to sell the vessel(s) to the Buyer, and the Buyer has agreed to purchase the same under the terms and conditions hereinafter set forth, and the Commission has made all necessary findings in connection therewith required under the provisions of the Act.
Now, therefore, in consideration of the premises and the mutual promises hereinafter set forth, the parties hereto agree as follows:
Article 1. Agreement to Purchase. — Subject to the provisions hereinafter set forth and to all applicable provisions of the Act and Regulations, whether specifically referred to or not, the Buyer agrees to purchase from the Commission and the Commission agrees to sell to the Buyer the vessel (s).
It is understood and agreed that if for any reason the vessel (s) cannot be delivered by the Commission to the Buyer as herein provided, similar vessel (s) acceptable to the buyer, may, pursuant to an addendum to this agreement, be delivered by the Commission in substitution therexor.
Article 2. Condition of the Vessel{s) upon Delivery. — The following provisions shall be applicable:
(a) “As is.” — The Commission shall deliver, and the Buyer shall accept, the vessel(s), “as is.”
$ ‡ ‡ ‡ ‡
Article 11. Additional Provisions. — The sale and delivery of the (each) vessel shall be subject to such modifications of the above provisions and to such additional provisions, if any, as may be incorporated into Exhibit “A” attached hereto and forming a part hereof. *****
Exhibit “A”
[Attached to and forming a part of Contract No. —] Vessel name Official No. Purchase price $544,506 (floor price as published in the Regulations). $544,506 (floor price as published in the Regulations).
I. Purchase Price(s) of the Vessel{s). — ~ * * * The Buyer agrees, if it shall be determined by the Commission upon examination of the (each) vessel, that *594 the vessel lacks or contains desirable features as defined in clauses (2) and (3) of Sec. 3 (d) of the Act, then such purchase price shall be decreased, within the limits of the floor price of the vessel, or increased, by such amounts, if any, as may be determined by the Commission pursuant to said clauses.
Jfc % ❖
Paragraph V, Exhibit “A”, of Southeastern’s contracts and paragraph YI, Exhibit “A” of Paco’s contract read in part:
Drydoching and Inspection — Allowance for Cost of Class Worh. — Article 2 (b) of the Contract to which this Exhibit “A” is attached and of which this Exhibit “A” is a part is cancelled and the following is substituted therefor:
$ $ $ ‡ $
In accordance with, and to the extent permitted by the provisions of the Independent Offices Appropriation Act for 1948, Public Law 269, 80th Congress, approved July 30, 1947, authorizing the Commission to make certain allowances to purchasers of vessels without regard to the provisions of the last paragraph of Section 3 (d) of the Merchant Ship Sales Act of 1946, the Commission shall reduce the purchase price of the vessel by an amount equal to the cost, as determined by the Commission, which would be required for the purpose of enabling the Commission to deliver the vessel to the Buyer in class with valid certificates of classification and inspection in accordance with the minimum requirements of the American Bureau of Shipping and the United States Coast Guard, Marine Inspection, rules and regulations outstanding as of the class date, hereinafter defined, including moving the vessel and drydocking if necessary for such purpose or if the vessel is due for drydocking or under-water inspection in accordance with the American Bureau of Shipping and the United States Coast Guard, Marine Inspection rules and regulations, and strengthening the vessel if the vessel is of the T2 type. The class date shall be the date of the execution of this agreement, unless the vessel is at sea on the date of execution of this agreement or makes a voyage otherwise than under bareboat charter to the Buyer after the date of execution of this agreement, in which event the class date shall be the date of completion of discharge upon the return of the vessel to the final port of discharge in the continental United States.
*595 22. After signing of the purchase contracts, it was necessary to determine the sales allowances in accordance with Article 2 as modified by paragraph Y, Exhibit A, of Southeastern’s contracts, and by paragraph YI, Exhibit A, of Paco’s contract, and the presence or absence of desirable features in accordance with paragraph I of Exhibit A of the contract, all quoted in finding 21.
Following the execution of a contract, the Ship Sales Division of the Commission would notify the Maintenance and Repair Division of the sale, and the latter, in turn, would notify its District Office having jurisdiction over the port where the vessel sold was located. The District Office would then notify its local office at that port.
Maritime Commission employees in the local office would contract the purchaser’s representative and explain to him the procedure to be followed in making the determinations called for in the sale’s contract, as referred to above.
At the time the six vessels involved in these claims were sold, this procedure was generally as set forth in findings hereafter.
23. The purchaser’s representative was given access to the vessel and he would have it moved to drydock. Representatives of the Commission, the American Bureau of Shipping, the Coast Guard, and the purchaser would then inspect the bottom of the vessel. If repairs were needed and the work necessary to effect these repairs could be performed for $15,-000 or less, or, if the purchaser indicated his willingness to absorb the cost in excess of this amount, the Commission’s representatives had authority to allow the purchaser to put this work “in hand”, at a negotiated price, with the shipyard where the vessel was located. In such instances the work on the bottom was performed at that time, and the purchaser was granted an allowance equal to the cost of the work up to $15,000. Otherwise, the work was deferred and was subject to competitive bids at a later date.
In either event, the vessel was then floated and the purchaser’s representative drafted preliminary specifications covering the opening and closing of the vessel’s machinery. This opening and closing constituted an item of expense in itself and did not cover any repair work to the machinery *596 which might be uncovered as a result of the opening. These preliminary specifications would be screened by the Commission’s representatives and submitted to shipyards for competitive bids.
At this point the Commission’s representatives had written authority after January 9, 1948, to follow a procedure analogous to that described above with regard to the bottom work. Where the opening of the machinery disclosed necessary repairs which could be performed for $15,000 or less or where the purchaser agreed to absorb the cost in excess of this amount, the Commission representatives had authority to negotiate the allowance covering this work in lieu of the work being submitted for competitive bids. In those instances where the purchaser elected to negotiate the allowance covering the results of the opening and closing, the Commission’s representatives had written authority after March 2,1948, to negotiate the allowance covering the remainder of the work.
The purchaser’s representative would prepare final specifications covering (1) repairs to machinery, (2) defense removals, and (3) all other items of work which he considered proper Commission sales obligations. These specifications would be screened by the Commission’s representatives who would negotiate with the purchaser as to the Commission’s sales obligation, the sales allowance being equal to (1) the cost of the necessary Bottom repairs, (2) the competitive bid price on the preliminary specifications, and (3) the negotiated price for the remainder of the work as set forth in the so-called final specifications. Where the bottom work had not been performed at the time the vessel was in drydock for underwater inspection, a purchaser desiring to follow the negotiated procedure with regard to the remainder of the sales allowance would include the necessary items of bottom work in the preliminary specifications.
24. Where the purchaser did not elect to follow the procedure as outlined in finding 23 whereby a sales allowance was negotiated, he would prepare final specifications covering (1) the necessary bottom work (unless this work had been performed at the time of the initial drydocking), (2) the results of the opening and closing of the machinery, *597 (3) defense removals, and (4) all other items of work he considered proper Commission sales obligations.
These final specifications would be screened by the Commission’s representatives and submitted for competitive bids. The vessel would then be moved to the shipyard of the successful bidder where the work covered by the specifications, as approved by the Commission, would be performed. In such instances, the sales allowance would be equal to the sum of the successful bids on the preliminary and final specifications. Where the bottom work had been performed at the time of the initial drydocking, the negotiated price for that work would be added to this sum.
25. Where the negotiated method of determining the allowance was followed, the effect was sometimes to hasten delivery of a vessel. This was due to the fact that some vessels at the time of sale had American Bureau of Shipping and Coast Guard certificates which were not then due for renewal. In such instances or, where a period of grace was allowed by the American Bureau of Shipping, and/or the Coast Guard, it was not necessary for all, or in some cases, any, of the work for which an allowance was granted to be performed at the time of the determination, as the work could be deferred until some later date when the purchaser considered it more convenient.
Negotiation also resulted in a saving of the time which would have been necessary to move the vessel to the shipyard of the successful bidder on the specifications, the same shipyard where the vessel was originally drydocked for underwater inspection not necessarily being the successful bidder on both sets of specifications. None of the contracts involved in the cases here in issue contained any terms specifying the time within which delivery of the vessels was to be made to the plaintiffs. However, if the plaintiffs had elected not to negotiate, the Commission, as shown in finding 19, could have put off delivery of the vessels until the allowances called for under the terms of the contracts could be determined by competitive bids. The Commission was interested in expediting delivery of Liberty tankers but it was mutually advantageous that it be done.
*598 26. Paco and Southeastern purchased all of the vessels on a mortgage basis. The Commission required that a mortgage condition survey be performed on all vessels sold on this basis. The surveys on the Pendleton, Barrett, Thompson, and Ellsworth were performed at or about the time of delivery of these vessels. Such surveys were not performed on the Sholes or the Cleveland at the time of the delivery because of the mistaken belief by the Commission’s representatives that these vessels were being sold on a cash basis. A survey was held in March of 1949 on the Cleveland, about one year after delivery, but none was ever performed on the Sholes. !
27. The purpose of the mortgage condition survey was to ascertain the condition of the vessel in order that the Government’s equity in the vessel would be protected. These surveys were made only by Commission representatives and the purchaser. Neither the Coast Guard inspectors nor the American Bureau of Shipping surveyors participated. The survey reports, however, did reflect the “outstanding requirements” of the Coast Guard and the “blackmarks” of the American Bureau of Shipping, which had been noted at the previous inspections by these bodies but which were not due for repair as a result of the sales procedure. These surveys noted no outstanding requirements or blackmarks on any of the vessels here involved which raise issues that are relevant to the question of fireproofing now in controversy.
28. The allowance determined by the several procedures described above was for the purpose of giving the Ship Sales Division a credit allowance figure prior to transfer of title to the vessel. In practice, the allowance reported by the local Maintenance and Bepair Division representatives was not necessarily final except as to the items it covered. The cost of items which, by mistake, were not included in the preliminary allowance subsequently could be allowed. These items included Coast Guard requirements which the local office slipped up on or did not know about when title passed. An example of this is the allowance of $1,375 made for work discovered later on the lifeboats of the Pendleton. Purchasers had no assurance that their claims for supplemental allowances would be granted when and if presented.
*599 29. The allowance against the purchase price to be granted the buyer was subject to proof that all of the work for which the allowance was granted had been completed and submission of the certified paid invoices to Washington. At that time a certificate of final verification was executed, indicating that the work for which the allowance was granted had been performed and paid for by the purchaser. As indicated, in the final verification the Commission sometimes allowed credit for items in addition to those included in the allowance reported by the local Maintenance and Repair Division representatives. The Commission also gave credit for the substitution of other work for specific items negotiated in the original specifications. Additional credit was granted for supplemental items or substitutions on the Pendleton, the Barrett, and the Ellsworth. Execution of the certificates of final verification was not intended by either party as a release of further claims against the Commission arising out of the purchase of the vessels, but the certificate was final as to the items it covered.
FINDINGS RELATING TO THE CLAIMS OF PACO TANKERS, INC., ARISING FROM PURCHASE OF THE S. S. “ WILLIAM E. PENDLETON” AND THE S. S. “OSCAR F. BARRETT”-NO. 49443
30. The contract between the Commission and Paco for the purchase of the Pendleton and the Barrett was signed on December 16, 1947. Each vessel was purchased for a price of $544,506.
The Ship Sales Division notified the Maintenance and Repair Division of this sale and the latter, on December 26, 1947, sent the following teletype to its District Office in New York:
SS WILLIAM E. PENDLETON DUE NO. HATT. DECEMBER 28TH AND S. S. OSCAR F. BARRETT DUE NO. HATT. JANUARY 4TH BEING SOLD MORTGAGE IN CLASS TO PACO TANKERS INC., CITIZEN SALE. CONTACT BUYERS REPRESENTATIVE KEYSTONE SHIPPING COMPANY, 1015 CHESTNUT STREET, PHILADELPHIA. SALES CONTRACT SIGNED DECEMBER 16, 1947.
31. On January 5, 1948, the local Maintenance and Repair office for the New York area was advised of the sale of the Pendleton “in class-mortgage” to Paco.
*600 On January 6, 1948, the Pendleton was placed in dry-dock at Todd-Hoboken shipyard where the bottomside of the vessel was inspected by the representatives of the American Bureau of Shipping, the Coast Guard, the Commission, and Paco. As the necessary items of repair disclosed by this inspection could be performed at a cost less than $15,000, Paco was allowed to place this work “in hand” with Todd-Hoboken on a negotiated basis for performance at that time.
After this work had been completed, the Pendleton was floated and Paco’s representatives drew up preliminary specifications covering the opening and closing of machinery. These specifications were submitted to the Commission for screening and thereafter submitted for competitive bids. The successful bidder was the Fred Beattie Repair Corporation, Brooklyn, New York. After inspection of the machinery and the remainder of the topside of the vessel, Paco representatives prepared final specifications covering the results of the opening and closing of the machinery, the defense removals, remaining class items and other work which they considered Maritime Commission sales obligations.
These final specifications were submitted to the Commission for screening and thereafter put out for competitive bids. The successful bidder was the Constable Hook Shipyard, Bayonne, New Jersey. The Pendleton was then moved to this yard from Brooklyn and the work covered by the final specifications performed.
32. On January 8, 1948, representatives of Paco and the Commission surveyed the Pendleton to determine the absence or presence of desirable features. The report of this survey did. not contain any “desirable features” pertinent to these claims.
Upon completion of the survey and the mortgage-condition survey a sales allowance was determined and the Commission in Washington was notified. On February 4, 1948, Paco received title and took delivery of the Pendleton. The sales allowance in the case of the Pendleton was $27,009, which on July 28,1948, due to the circumstances surrounding the necessary repairs to the two lifeboats as previously set forth, was raised to $28,625. On or about August 30, 1948, *601 Paco submitted proof of the performance, and payment therefor, of the work for which the allowance of $28,625 had been granted, and thereafter the Commission credited Paco’s mortgage account on the Pendleton by this amount. The credit allowance for the Pendleton was verified on July 8, 1948. In response to notice thereof Paco notified the Commission on July 15 and repeated its reservation of right to reimbursement of any additional claims the Commission and Paco might agree on, arising from the contract of sale.
33. On January 5,1948, the local Maintenance and Repair office of the New York area received notice from the District Office of the sale of the Barrett “in class.”
On January 8, 1948, the Barrett was placed in drydock at Todd-Hoboken shipyard for underwater inspection and thereafter underwent inspections and surveys comparable to those described in the case of the Pendleton.
On January 26, 1948, the local office notified the Commission in Washington that the sales allowance on the Barrett amounted to $21,376 and on February 4,1948, Paco received title and took delivery of the Barrett. On or about August 5,1948, Paco submitted proof to the Commission of the performance, and payment therefor, of the work for which the allowance of $21,376 had been granted, and thereafter the Commission credited Paco’s mortgage account on the Barrett by the adjusted amount of $21,367. The difference between this amount and the sales allowance was due to an error in shipyard billings and the use of actual American Bureau of Shipping survey fees in lieu of estimates.
As in the case of the Pendleton, Paco did not regard nor accept this sales allowance as the total obligation of the Commission. In June 1948 at the time of verification of the repairs on the Barrett, Paco reserved its rights for reimbursement of additional claims arising from the contract if allowed by the Commission on subsequent presentation.
34. Throughout the period of approximately two weeks that the Barrett and the Pendleton were in the shipyard prior to preparation and submission of final specifications, Paco’s representatives had complete access to these vessels. Paco’s inspectors on board were at all times under the supervision *602 of Captain C. C. Williams, a man of great experience in the tanker trade, whose duties encompassed the responsibility of seeing that the vessels under his control complied with all applicable rules and regulations of the various regulatory bodies. The inspectors under his supervision were experienced in their work.
During the period of inspection, the Paco representatives had no knowledge of any of the correspondence between the Commandant of the Coast Guard and the Commission as set forth in findings 4 through 7. Plaintiffs were also unaware of the matters related in finding 57. None of the specifications submitted by Paco to the Commission for screening contained items of work the performance of which would have placed either the Barrett or the Pendleton in compliance with the rules of the Coast Guard pertaining to “fireproofing” of tanker vessels, as published in the Federal Eegister in 1936. Among these rules was Section 32.2-5, Subchapter D, Eules Governing Tank Vessels, which stated:
Diving Quarters — TB/ALL Partitions and sheathing shall be of approved fire-resistive construction.
No inquiry was made of the Coast Guard by any of Paco’s representatives to ascertain why the Coast Guard did not cite its regulations on fireproofing as “requirements outstanding” in the reports submitted to Paco’s representatives after Coast Guard inspectors had examined the vessels, nor did these inspectors volunteer any information on the subject. The evidence establishes that while the fireproofing regulations were outstanding in the opinion of the Coast Guard Officer in Charge of Marine Inspection in the New York Zone, nevertheless, prior to February 20, 1948, his office did not require owners of Liberty-type tankers to fireproof their vessels because of lack of regulations from Washington headquarters granting authority to compel it. Prior to said date, there were no instructions from headquarters informing Coast Guard inspectors whether or not such vessels should be certified in the absence of fireproofing. Like Paco’s representatives, the Coast Guard inspector in charge was unacquainted with the correspondence and negotiations between the Commission and the Coast Guard in 1942-43 as *603 set forth in findings 4 through 7. The evidence also establishes that local Commanders of the Coast Guard Districts assumed that the vessels originally constructed and certificated in other Districts were constructed in compliance with all applicable regulations.
35. There was nothing noted on the certificates of inspection, issued by the Coast Guard at the Commission’s request, which would indicate that they might be construed by the defendant’s agents as restricted and conditional on any of the vessels involved here.
Notice of the deferral of enforcement of the fireproofing requirements was not published in the Federal Register, although notices of relaxation of some other Coast Guard requirements were published from time to time. As general agents, Paco operated Liberty tank vessels owned by the Commission during 1945, 1946 and 1947. These vessels had Coast Guard certificates and were subject to inspection. No notice was given to Paco during the general agency operation that the certificates were restricted or conditional nor did Paco raise any question about it.
FINDINGS RELATING TO CLAIMS OF SOUTHEASTERN OIL DELAWARE, INC., ARISING FROM PURCHASE OF THE S. S. “JACOB THOMPSON5’ AND THE S. S. “HENRT L. ELLSWORTH5’ — NO. 48963
36. On October 29,1947, Southeastern Oil Company, Inc., parent company of plaintiff Southeastern, made application to the Commission for the purchase of four tank vessels. Subsequently, Southeastern Oil Company, Inc., was allocated two Liberty-type tankers.
On January 2,1948, John N. Blow, President of Southeastern, wrote the Commission the following letter with regard to the purchase of these two vessels:
With reference to the contract of purchase covering the above vessels and letter of transmittal and related documents we wish to go on record as protesting against the failure of the Commission to protect our statutory rights to a standard ship. Because of the provisions of this contract with regard to repair adjustments, allowance list items, etc., and the various other provisions of the contract, there is serious danger that we may not receive the standard ship of this class which we are en *604 titled to under the statute and the Commission’s General Order 60.
We trust that the Commission upon further consideration will recognize the merits and grant us appropriate additional allowance to cover the deficiencies.
37. The contract between Southeastern and the Commission for the purchase of the Ellsworth, and the Thompson was signed on February 3,1948. The purchase price of each vessel was $544,506. Thereafter, the Ship Sales Division notified the Maintenance and Repair Division of the sale and the latter, on February 4, 1948, sent the following teletype to its District Office in New York:
SS JACOB THOMPSON DUE NEW YORK FEBRUARY 12 1948 AND SS HENRY L ELLSWORTH DUE NEW YORK FEBRARY 12 1948 LIBERTY TANKERS HAVE BEEN SOLD TO SOUTHEASTERN OIL INC. TERMS OF SALE CITIZEN MORTGAGE IN CLASS. MC TO PERFORM NO WORK, BUYER TO BE GRANTED ALLOWANCE FOR SALES OBLIGATION. CONTRACT SIGNED FEBRUARY 3 1948 CONTACT BUYERS REPRESENTATIVE SOUTHEASTERN OIL INC 60 EAST 42ND ST NEW YORK NEW YORK. JH-327.
38. On February 6,1948, the local Maintenance and Repair Office for the New York area received the following memorandum from the District Office regarding the sale of the Thompson:
Reference is made to the Assistant Local Manager’s letter F-320 dated February 4, 1948, wherein you authorized $40,358.00, total expenditure for repairs to the subject vessel under contract with Bethlehem Steel Company, 27th Street, Brooklyn Yard.
This is to advise that final contract of sale this vessel was signed February 3,1948, specifying delivery of ship In Class-Mortgage to Southeastern Oil Inc., located at 60 East 42nd Street, New York City.
It is requested that you arrange a conference immediately with representatives of the Bethlehem-27th Street Brooklyn Yard, and the buyer, for purpose of having buyer assume immediately for his account all obligations for total repairs to date, in the amount of $40,358.00. Buyer has already indicated his willingness to such an agreement and based on Bethlehem-27th Street, Brooklyn Yard, agreed to this procedure as the result of your meeting.
If Bethlehem-27th Street, Brooklyn Yard is agreeable, you are further requested to cancel our contract with *605 Bethlehem-27th Street Brooklyn Yard, such cancellation to be of same date of original award, namely Job Order No. Ill dated January 26,1948.
You are further requested to screen all work under our original contract with respresentative of the buyer, and report in accordance with instructions our letter of January 12, 1948 (FD-28), the obligations considered USMC obligations with respect to sale.
You are also requested to survey the vessel with the buyer’s representative for additional defense removals, and American Bureau and U. S. Coast Guard requirements not covered by the original contract, and negotiate with the contractor the cost thereof for each item, with the understanding that the buyer is to award this work to the contractor for his account, this money to be included in your report as outlined our letter of January 12, 1948 (FD-28). .
Forward to this office, five copies of the original contract and all supplements, together with five copies of the additional defense removals and/or Classification and Coast Guard requirements, negotiated price for the additional removals to be shown alongside of each item.
Also survey the vessel jointly with Buyer’s representative for desirable features and mortgage purposes, forwarding to this office the usual five copies of presence or absence of desirable features aboard the vessel and the usual five copies of mortgage condition survey report.
39. At the time of the sale the Thompson was in the Bethlehem Steel Corporation shipyard in Brooklyn undergoing an American Bureau of Shipping survey. Specifications had been prepared by Maritime Commission surveyors and a contract entered into with Bethlehem, apparently on a competitive bid basis, covering the necessary repairs uncovered by this survey and other work considered necessary by the Commission in contemplation of the Thompsons continued operation by a general agent for the Commission’s account.
In accordance with instructions contained in the memorandum set forth in the finding above, agreement was reached with Bethlehem Steel whereby Southeastern took over the Commission’s contract covering the work contained in the previously prepared specifications. South *606 eastern’s representatives then made their own inspection and survey of the Thompson and thereafter prepared additional specifications covering items of work not included in the specifications previously prepared by the Commission which Southeastern considered Maritime Commission sales obligations.
Representatives of the Commission and Southeastern then went over all of the specifications and Southeastern’s representative indicated those items in the original specifications which he considered Commission sales obligations. The Commission representative screened all of the specifications and removed therefrom any items which he did not consider proper Commission sales obligations. Southeastern was then granted an allowance for the remaining items of work contained in the original specifications equal to the price in the contract with Bethlehem for this work. Southeastern’s representative was allowed to place the work contained in the additional specifications “in hand” with Bethlehem Steel for performance at that time together with the work set forth in the original specifications. At the close of the negotiation on the Thompson on February 13, 1948, H. B. White, Vice President of Southeastern, executed the document set forth in full in finding 40.
40. In connection with the delivery of three out of the six vessels, Mr. Harry A. Peterson, Maintenance and Repair Division representative of the Commission, required that representatives of Southeastern sign certain documents. These were executed prior to delivery of the Thompson, Ellsworth, and Cleveland,
(a) The document applicable to the Thompson provided:
February 13, 1948.
To: Mr. C. B. Yule, Local Manager, M & R Division, 17. S'. M. C.
From: H. B. White, Southeastern Oil Company, Representative.
Subject: S. S. Jacob Thompson.
This will advise you that we hereby agree to waive all further claims of cost of any and all requirements from *607 United States Coast Guard and American Bureau of Shipping in excess of the following:
Original Contract Job Order #111_______________$28,336. 00
(A) Contract Job Order #111-A______________ 960.00
Defense Removals________________________________ 7,929.00
American Bureau Special #1 and U. S. C. G. Requirements__________________________________________ 13,105. 00
American Bureau Special Under Water Work______ 364.00
Bow Damage American Bureau Requirement (Third
Party)_________________________________________ 695.00
Grand total_________________________________ 51,389.00
(S) H. B. White,
H. B. White, Authorized Representative Southeastern Oil Company.
(b) The document applicable to the Ellsworth provided:
February 20, 1948.
To: Mr. C. B. Yule, Local Manager, M & B Division, U. S. M. C.
From: Bobert W. Morrell, Surveyor for Southeastern Oil Co.
Subject: S. S. Henry L. Ellsworth.
This will advise you that we hereby agree to waive all further claims of cost of any and all requirements from United States Coast Guard and American Bureau of Shipping in excess of the amount of $43,160.00, or any future items of work pertaining to the sale of the subject vessel.
(S) Bobert W. Morrell,
Bobert W. Morrell,

Authorized Representati/oe Southeastern Oil Company.

(c) The document applicable to the Cleveland provided:
April 21,1948.
U. S. Maritime Commission,

M. <& R. Division,

46 Broadway, New. York, N. Y.

Attention: Mr. H. A. Peterson.
Gentlemen : This is to advise that we hereby agree to accept for the following an allowance against the purchase price of the S. S. Richard J. Cleveland the sum of $28,743.00.
*608 Preliminary Specifications dated New York
3/19/48_____________._______________________$10,383.00
Results of opening and closing in preliminary
specifications, negotiated-------------------- 7, 653.00
Underwater work, negotiated----------------- 5, 048. 00
Defense removals, negotiated------------------ 5,245.00
American Bureau of Shipping estimated fees— 415.00
Transportation charges, propeller------------- 180. 00
28,924.00
Less credit $81.00 result of closing machinery and $100.00 scrap allowance______________________ 181. 00
Total_______________________________________ 28, 743.00
Very truly yours,
Transfuel Corporation,
(S) George Heris,
George Herís, President.
Mr. Peterson had oral authority from the Commission to obtain such statements in connection with negotiated sales, as set forth in this finding, but it was not made mandatory that he do so and it is not shown they were obtained in all such cases. Southeastern was not required to execute a document in any form prior to delivery of the Sholes, nor was Paco required to execute any document prior to delivery of the Barrett and the Pendleton.
41. Mr. Peterson testified that he required execution of these documents in cases where the purchaser elected to defer opening and inspection of the machinery, as in the case of the Ellsworth. The document was intended as evidence that the buyer agreed not to claim allowance for items revealed at the time the machinery was actually opened. Mr. Peterson required such a document in the event the machinery was opened for inspection but the purchaser chose to defer performance of the work found upon inspection. In either case, the document was to limit the allowance for performance of the enumerated items of work, regardless of the actual cost of performance of such work at a subsequent time.
42. Mr. Peterson did not intend that execution of the documents, required in connection with the negotiated price procedure, should deprive Southeastern of any of its rights under the Ship Sales Act or the contracts. By these documents he did not intend that Southeastern release or waive its rights to any of the items excluded from the preliminary allowance *609 by mistake. On February 13 and 20,1948, when the Thompson and Ellsworth documents were executed, Peterson (who acted for the Commission) had no knowledge that the vessels were not fireproofed. He had no knowledge of this until February 24, 1948, or possibly February 23. He had no knowledge of the Coast Guard release of February 20, 1948, set forth in finding 49, at the time of delivery of the Thompson, Ellsworth, Pendleton, and Barrett and there was no discussion of fireproofing requirements at the time the documents were executed. Mr. Peterson did not know whether the Commission would accept responsibility for the cost of compliance with these requirements and, accordingly, wired the Commission for instructions in this connection on February 24 and 25, 1948.
43. The Commission on March 11,1948, ruled that no purchaser of a Liberty tanker would receive an allowance for the cost of complying with the outstanding fireproofing requirements. At its meeting on that date the Commission tentatively decided that Liberty vessels would not be delivered unless the bills of sale were qualified in such manner as to preclude purchasers from making claims for allowances for the cost of fireproofing thereafter. To accomplish this result, the bills of sale were to be conditioned in the following manner:
Enclosed bill of sale for the vessel__________is being delivered to the________, with the distinct understanding that such----------will be required to perform such fireproofing work on the vessel as and when required by the United States Coast Guard subsequent to March 31, 1948, the cost of which work will not be assumed by the United States.
On March 22, 1948, the Commission heard the argument of counsel for the plaintiffs in support of allowance for cost of the fireproofing work as a credit against the purchase price. Counsel also urged that “the Commission issue instructions to its staff not to require any of the purchasers of these vessels to waive their rights to any claims which would preclude them from having redress at law.” As a result of the appearance and argument by counsel for plaintiffs on March 22, 1948, the Commission reconsidered its *610 action of March. 11 and at its meeting on March 26 directed that purchasers of Liberty tankers not be required to waive their rights in connection with any claims for the cost of fireproofing the vessels as required by the Coast Guard regulations. The Commission’s instructions to implement this decision are set forth in finding 55. Bills of sale for each of the vessels in these actions were executed on the standard government form by the Commission and delivered to the plaintiffs without the foregoing, or any other, condition or qualification. The Commission and its successor, the Maritime Administration, by a special contract clause inserted in the contracts for sale of Liberty tankers after March 26,1948, continued that principle and expressly reserved the rights of such purchasers to their claims for allowances for the cost of the fireproofing work.
44. On February 16,1948, representatives of Southeastern and the Commission made a joint mortgage condition survey of the Thompson. The report of this survey states in part:

Outstanding items

A. B. S____________ S. S. #1 not completed. See attached list
of outstanding items.
U. S. C. G__________None.
F. O. O____________None.
A desirable feature survey had previously been made on February 10, 1948. The report of this survey did not contain any desirable features pertinent to these claims.
On February 16, 1948, Coast Guard inspectors completed an annual inspection of the Thompson, and as a result thereof, on February 17, 1948, the Coast Guard issued this vessel a certificate of inspection bearing no notations of a restricted or conditional nature on its face.
On February 16,1948, the local office notified the Commission in Washington that the sales allowance on the Thompson amounted to $51,389, and on February 17,1948, Southeastern received title and took delivery of this vessel. On or about December 17,1948, Southeastern submitted proof to the local office of the Commission of the performance, and payment therefor, of the work on the Thompson for which the allowance of $51,389 had been granted, and the Commission then refunded this sum to Southeastern in cash.
*611 45. On February 5,1948, the local Maintenance and Eepair Office for the New York area was advised of the sale of the Ellsworth “in class.”
On or about February 10, 1948, the Ellsworth was placed in drydock at Bethlehem Steel shipyard in Brooklyn. On February 10, 1948, representatives of the Commission and Southeastern made a joint mortgage condition survey of the Ellsworth. The report of this survey contained the following statement:
A. B. Special survey # 1 started but not completed at the time of this survey.
There are no U. S. C. G. M. I. or F. C. C. requirements at this time.
A desirable feature survey was also made on February 10, 1948. The report of this survey did not contain any desirable features pertinent to these claims.
46. On or about February 11, 1948, representatives of Southeastern and the Commission inspected the bottom of the vessel and noted the items of work necessary to be performed thereon. As the cost of this necessary work came within the $15,000 limitation, Southeastern was allowed to put this necessary work “in hand” with Bethlehem Steel on a negotiated basis for performance at this time. Thereafter, representatives of Southeastern drafted specifications covering the opening and closing of machinery, defense removals, class items and all other items of work which they considered Maritime Connnission sales obligations. On February 19, 1948, they submitted these specifications to the Commission for screening. In lieu of submitting these specifications for competitive bids, Southeastern’s representatives elected to negotiate the allowance covering the remaining sales obligations. At the close of the negotiation, on February 20, 1948, Southeastern’s representative, Eobert W. Morrell, executed the agreement set forth in full in finding 40.
On February 24, 1948, the local office notified the Commission in Washington that the sales allowance on the Ells-worth amounted to $43,160. On this same date Southeastern received title and took delivery of this vessel. On or about February 15,1949, Southeastern submitted proof to the local office of the Commission of the performance, and payment *612 therefor, of work on the Ellsworth for which an allowance had been granted, and the Commission credited Southeastern’s mortgage account on the Ellsworth in the amount of $42,995. The difference between this amount and the sales allowance was due to several items of work (for which an allowance had been granted) which had not been performed or paid for by Southeastern, and to the use of actual American Bureau of Shipping fees in lieu of estimates.
47. During the early part of February 1948 Robert W. Morrell was employed by H. B. White, Vice President of Southeastern, to represent his company during the procedure necessary to determine the sales allowances on vessels purchased by Southeastern from the Maritime Commission. Mr. Morrell was to survey the vessels with the surveyors and inspectors of the Commission, the American Bureau of Shipping and the Coast Guard to ascertain whether or not the existing specifications completely covered all requirements of the sales contract that the purchaser was entitled to have carried out. He was hired as an independent surveyor and paid a fee. Robert W. Morrell and his son, Robert C. Morrell, who was in his father’s employ, were both naval architects and experienced marine surveyors. Robert W. Morrell had first-hand knowledge of the design and construction of Liberty-type vessels since he served as assistant general manager in the construction of Liberty vessels and coastal tankers at the Todd-Houston shipyards during World War II. Representatives of the Commission explained to the Morrells the procedure to be followed to determine the sales allowances. It was understood that the Morrells, as representatives of the purchaser, were to draw up specifications covering the work they considered to be the Maritime Commission’s sales obligations, which would be discussed with them by representatives of the Commission who would screen and negotiate upon them.
Robert C. Morrell inspected and surveyed the Thompson and the Ellsworth. He was given complete access to both vessels and not hindered in any way in making these inspections.
Subsequently, he and his father, in drafting the specifications for submission to the Commission, included therein *613 all items of work which, they considered Commission sales obligations. As a matter of practice they asked for more than they knew Southeastern was entitled to receive. Eobert W. Morrell understood that the execution of the two documents, as set forth in finding 40, were the last steps in the procedure to determine the Commission’s sales obligations arising out of the purchase of the Thompson and the Ellsworth.
With reference to these two documents, H. B. White had signed the one relating to the Thompson on February 13, 1948. Soon thereafter he authorized Eobert W. Morrell to execute a similar document at the close of the negotiations on the Ellsworth. In signing these documents, both H. B. White and Eobert W. Morrell were acting within the scope of their authority.
48. At the time the specifications on the Thompson and the Ellsworth were submitted to the Commission and the documents set forth in finding 40 were executed, Eobert W. Morrell and his son knew that the Liberty-type tanker, as originally constructed, was not fireproofed, and from unrestricted inspections of these two particular vessels the son knew that the Ellsworth and the Thompson had not been fireproofed.
At that time the Morrells had actual knowledge of Sub-chapter D, Eules Governing Tank Vessels, as published in the Federal Eegister in 1936, including Section 32.2-5 thereof, as set forth in finding 34. On the other hand, they had no knowledge of any of the correspondence between the Commandant of the Coast Guard and Admiral Vickery of the Commission, as set forth in findings 4 through 7.
None of the specifications on the Ellsworth or the Thompson., which they submitted to the Commission, contained items of work which would have placed either of these vessels in conformity with these rules and regulations as published in the Federal Eegister in 1936.
Neither of the Morrells, nor any other representative of Southeastern, made any inquiries at the Coast Guard to ascertain why the Coast Guard did not cite these portions of its general rules and regulations as “requirements outstanding” in the reports submitted to Southeastern’s representatives after Coast Guard inspectors had examined the *614 vessels. The Morrells testified that they did not include fireproofing items in the specifications nor did it occur to them that it should be done, because the ships apparently had a clean bill of health as they stood, with no waivers noted on their certificates. Further, they had been permitted to operate for several years by the Coast Guard in their existing condition and there had been no casualties because of deficiency in fireproofing.
49. On February 20, 1948, Admiral H. C. Shepheard, by direction of the Commandant, sent the following instructions to all District Coast Guard offices:
Subj: Liberty tankers, relaxations from Tank Vessel Regulations.
1. Reference is made to your letter of 17 February, 1948, file CG-MIN-68 inclosing an application for a waiver until 31 March, 1948, of the provisions of 46 CFR 32.2-5 in the case of the S. S. Harvey W. Wiley. The application for waiver is returned herewith, granted.
2. Inasmuch as the Maritime Commission design Z-ET1-S-C3 (the so-called Liberty tanker) was a conversion from the Liberty dry cargo vessel, made during the war under emergency conditions, several relaxations from the Tanker Rules were necessary in order to expedite the readying of these vessels for service. At the time of the conversions, the Maritime Commission stated that such deficiencies would be corrected at the first practicable opportunity.
3. With the return to peacetime operation of the Merchant Marine, HQ, considers that these vessels should be brought into full compliance with the applicable regulations and accordingly, no waivers of deficiencies, extending past 31 March, 1948, will be issued them even though the Coast Guard’s power to waive the navigation laws should be extended beyond this date. Certificates of inspection of Liberty tankers, having waivers of deficiencies, should be rescinded on 31 March, 1948, and should not be returned until the vessels are in compliance with the Tank Vessel Regulations.
4. Attention is invited to the fact that, in addition to noncompliance with 46 CFR 32.2-5, most of the subject vessels do not comply with 46 CFR 34.2-4, Location of fire pumps.
5. The Commanders of the other seaboard Coast Guard Districts are being informed of HQ’s policy in regard to certification of Liberty tankers by a copy of this letter.
*615 50. Upon receipt of these instructions, the District Coast Guard office in New York issued the following circular letter to all Coast Guard inspectors:
CIRCULAR LETTER TO ALL INSPECTORS
Subject: Liberty tank vessels.
Effective immediately, Headquarters has directed the following requirements be placed on the subject vessels. Requirements are to be placed on these vessels at annual inspections or when vessels are undergoing major dry dock repairs.
1. Install additional fire pump outside machinery space, preferably in after pump room, starboard side.
2. All wood joiner work in quarters to be replaced with fire resistant material.
3. Extension rods to cargo valves forward of engine room to be rerouted through expansion trunk spaces when cargo above Grade E is carried; for Grade E cargo, no change in extension rods is required.
51. Soon thereafter Robert W. Morrell learned of the action taken by the Coast Guard, as set forth above, and inquired at the District Office of the Commission in New York as to the Commission’s policy with regard thereto. The District Office immediately requested instructions from the Commission in Washington.
52. On February 25, 1948, the Maritime Commission in Washington received two letters from H. B. White, Vice President of Southeastern, one dated February 19, 1948, relating to the Thompson and one dated February 26, 1948, relating to the Ellsworth. These two letters, written shortly after the vessels were delivered, were identical in form and content and stated:
Upon taking physical delivery of the above vessel, we wish to state our position with respect to certain open matters, as follows:
1. At the time of signing and delivery of the contract, we handed to the Commission a letter in which we protested the position of the Commission with respect to certain matters therein referred to affecting the condition of the vessel as delivered. We wish at this time to renew our protest with respect to all such matters.
2. At the time of taking delivery of the vessel, we understood that there was a general waiver in effect by the *616 Coast Guard with respect to fireproofing of crew’s quarters on the vessel and additional fire pumps. We regard the items as outstanding requirements and believe that the Commission should make the allowances to us as purchasers under the provisions of our contract of sale for the cost of complying with the Coast Guard requirements as though there was no waiver in effect.
3. There are, of course, various other adjustments to which we are entitled, such as the cost of moving the vessel, costs incurred by the agent for the vessel insurance, etc., all of which we assume will be adjusted in due course.
53. On March 1, 1948, and at numerous subsequent meetings, the U. S. Maritime Commission considered the question of whether the purchasers of Liberty-type tankers should be granted a further allowance in the purchase price to cover the cost of “fireproofing.” On March 15,1948, the Commission determined that the cost of “fireproofing” Liberty-type tankers would not be assumed by the Commission and ordered that the following instructions be transmitted to all of its local offices:
QUOTE BE LIBERTY TANKERS BEING SOLD. IN CONNECTION COAST GUARD FIREPROOFING AND PROTECTION REQUIREMENTS DEALING WITH REMOVING WOOD JOINER WORK AND PLYWOOD SHEATHING AND REPLACING WITH FIRE RESISTANT MATERIAL. ALTERATION OF ELECTRICAL INSTALLATION IN GENERAL. REARRANGEMENT AND/OR ADDITIONAL FIRE PUMP. CONTROLS TO CARGO VALVES AND REARRANGEMENT BILGE PUMP SUCTIONS TO DIRECT DISCHARGE OVERBOARD DISCONNECTING AND BLANKING OFF CONNECTIONS FROM PUMP ROOMS TO MACHINERY SPACE BILGE PUMPS. YOU ARE ADVISED THAT THE COMMISSION BY ITS ACTION OF MARCH 11, 1948 HAS RULED THAT THE COST OF THIS WORK WILL NOT REPEAT NOT BE ACCEPTED FOR COMMISSION ACCOUNT NOR WILL ALLOWANCES BE GRANTED BUYERS IN SALES PRICE OF VESSELS FOR COST OF THIS WORK. FURTHER NONE OF THE FOREGOING COAST GUARD REQUIREMENTS ARE TO BE INCORPORATED IN SPECIFICATIONS WHICH ARE ISSUED TO BID BY MC FOR SALES ALLOWANCE. THE FOREGOING ACTION DOES NOT PRECLUDE ACCEPTANCE FOR MC ACCOUNT THE RESTORATION OF GUN CREW QUARTERS TO STANDARD AS HERETOFORE IN ACCORDANCE OURTEL C-209 OF JANUARY 28, 1948.
54. This was followed by a second instruction on March 22,1948, which read as follows:
*617 SUPPLEMENTING OUR FD — 1022, THE FOLLOWING TELETYPE JII 510 FROM MR. D. S. BRIERLEY, CHIEF, M & R DIVISION, IS QUOTED IN FULL FOR INFORMATION AND COMPLIANCE:
FURTHER OURTEL JH-482 YOU ADVISED THE COMMISSION IN ITS ACTION 3/15/48 DIRECTED THAT IN CONNECTION WITH LIBERTY TYPE TANKERS YOU CAREFULLY SCREEN SPECIFICATIONS AND REPAIR CONTRACTS FOR PURPOSE ELIMINATING THEREFROM FOR THE ACCOUNT OF THE GOVERNMENT ANY ITEM WHICH MIGHT BE ATTRIBUTABLE TO THE FIREPROOFING REQUIREMENTS OF THE COAST GUARD.
55. On April 2, 1948, in accordance with, action taken by the Commission, the following instruction was transmitted to its local office:
QUOTE FOR YOUR INFORMATION COMMISSION BY ITS ACTION MARCH 26, 1948 DIRECTED THAT NO DELIVERY OF ANY LIBERTY TANKER BE MADE IN ANY CASE WHERE THE PURCHASER HAS FILED ANY PROTEST. COMMISSION ALSO DIRECTED THAT PURCHASERS OF LIBERTY TANKERS BE NOT REQUIRED TO WAIVE THEIR RIGHTS IN CONNECTION WITH ANY CLAIMS FOR THE COST OF FIREPROOFING OF SUCH VESSELS AS REQUIRED BY RECENT COAST GUARD ORDERS BUT MUST ACCEPT BILLS OF SALE UNCONDITIONALLY.
56. The Coast Guard Rules and Regulations Governing Tank Vessels set forth the requirements for certifying all tank vessels by the Coast Guard. The regulations applied with equal force to Government-owned and privately owned tank vessels. The Coast Guard requirements prescribed by the regulations which are material to the issues in these cases were set out in the regulations and more particularly described in a release of the Coast Guard dated March 4,1948, providing:
Subj: Alterations required on Z-ET1-S-C3 (Liberty type) Tank Vessels, to conform with Regulations Governing Tank Vessels, Subchapter D, Title 46, Shipping.

A ccommodations:

All wood joiner work, including bulkheads, doors, ceilings and linings, shall be removed from the living quarters in the midship house on the main deck and above and in the poop house. Replacements shall be of metal, Class B bulkhead material, or approved incombustible materials. All insulation in these spaces *618 shall be examined to determine its suitability in accordance with CFR 32.2-5. The above requirements do not apply to the wheelhouse proper, but will apply to all accommodations on that deck aft of the forward end of machinery space housing.

Electrical:

The electrical installation in general shall be examined to determine its suitability for continued use in accordance with Sections 32.6-1 to 32.6-6, inclusive. Special attention shall be given to installations in pump rooms and dry cargo or shelter deck spaces.

Fire Pumps:

Fire pumps shall be rearranged to conform with Section 34.2-4, which requires that on vessels of this type, one of the fire pumps shall be located in an accessible space separate from the machinery compartment.

Cargo Valve Controls:

Reach rods and controlling mechanism passing through the shelter deck spaces shall be rearranged to extend inside the expansion trunks or other suitable provisions shall be made to prevent leakage in shelter deck spaces.

Bilge Pump Suctions:

The bilge pump suctions in pump rooms shall be arranged for direct discharge of drainage overboard. Connections from pump rooms to machinery space bilge pumps are to be disconnected and blanked off.

Structural Alterations:

All tank vessels of this class are required to be strapped in accordance with the provisions contained in Coast Guard plans for the alteration of Liberty type vessels.
The foregoing regulations, including the fireproofing requirements, were first compiled and promulgated in 1936. No change in the fireproofing requirements of the regulations has been made since 1936 except as heretofore noted regarding the waiver of authority for their enforcement exercised by the Commandant of the Coast Guard and the Secretary of Navy pursuant to authority from Congress.
57. In October and December of 1947, prior to the date of the contracts covering the sale of these vessels, W. G. Allen, Engineering Assistant to the Chief of the Tanker Division, *619 Bureau of Operations of the Commission, conferred with officers of the Bureau of Marine Inspection and Navigation of the Coast Guard, seeking information as to what was to be done to have them (Liberty Z-ET1-S-C3 tankers) comply with tanker regulations and asking for a list of deficiencies. Captain Smyth, Chief of the Technical Division of the Bureau, advised Mr. Allen that fireproofing requirements, among others, “appear to be applicable to the subject vessels for peacetime operation.” The outstanding requirements included items contained in the March 4,1948, release of the Coast Guard.
58. On March 12, 1948, the Commandant of the Coast Guard issued the following order:
NOTIFY CGMI EFFECTIVE IMMEDIATELY NO CERTIFICATE OF INSPECTION SHALL BE ISSUED TO LIBERTY TANKERS NOT IN COMPLIANCE WITH REQUIREMENTS FOR FIREPROOFING OF CREW QUARTERS 46 CFR 32.2-5 AND OTHER TANKER REGULATIONS UNLESS WAIVER OF SUCH REQUIREMENTS COMMA EXPIRING 31 MARCH COMMA 1948 COMMA IS STATED IN CERTIFICATE OF INSPECTION X ALL CERTIFICATES OF INSPECTION OF LIBERTY TANKERS ARE TO BE WITHDRAWN ON 31 MARCH COMMA 1948 COMMA UNLESS VESSEL IS IN FULL COMPLIANCE 46 CFR 32.2-5 AND OTHER TANKER REGULATIONS X CERTIFICATES MAY BE RETURNED TO OWNERS OR OPERATORS PREFERABLY ON EVIDENCE OF A CONTRACT TO PLACE VESSEL IN FULL COMPLIANCE BY 1 SEPTEMBER COMMA 1948 COMMA OR IF SUCH CONTRACT CANNOT BE CONSUMMATED FOR REASONS BEYOND CONTROL COMMA ON RECEIPT OF A COMMITMENT IN WRITING THAT SUCH FIREPROOFING AND OTHER TANK VESSEL REQUIREMENTS WILL BE COMPLIED.
In accordance therewith, Paco and Southeastern were allowed, temporarily, to operate the vessels purchased without “fireproofing.”
FINDINGS RELATING TO THE CLAIM OE SOUTHEASTERN OIL DELEWARE, INC., ARISING OUT OE THE PURCHASE OE THE S. S. “RICHARD CLEVELAND” AND THE S. S. “CHRISTOPHER SHOLES5’— NO. 48964
59. Subsequent to the purchase of the Thompson and Ells-worth and the action of the Coast Guard on February 20, 1948, as set forth in finding 49, the Commission allocated Southeastern two additional Liberty-type tankers and on February 26, 1948, Southeastern signed a contract for the purchase of the Cleveland and the Sholes. The purchase *620 price of each of these vessels was the same as for the others involved in this action, namely, $544,506, which was the floor price published in the regulations.
In the case of the 8'holes, the competitive bid procedure comparable to that used in the case of the Barrett and Pendleton was followed to determine the sales allowance. On the Cleveland the allowance was determined on a negotiated basis as in the case of the Ellsworth, except that the allowance covering the underwater work was determined by the use of competitive bids. Subsequent to dispatch of notice by the Coast Guard on February 20, 1948, that fireproofing work constituted an outstanding requirement, specifications were prepared outlining the work necessary to put the Bholes and Cleveland in class and covering fireproofing.
In both instances Southeastern representatives submitted specifications to the local office of the Commission in New York. These fireproofing items were deleted from the specifications by the local office in accordance with instructions received from the Commission in Washington on March 15 and 22, and April 2,1948.
On May 5,1948, after the determination of the sales allowance on these two vessels, Southeastern received title and delivery of the Cleveland and the Bholes. At or about this time written demand for an allowance covering fireproofing on these vessels was lodged with the Commission.
In the case of the Cleveland the sales allowance amounted to $28,743. On or about February 11, 1949, Southeastern submitted proof to the Commission of the performance, and payment therefor, of work for which an allowance had been granted, and the Commission then credited Southeastern’s mortgage account on the Clevelcmd in the amount of $28,687. The difference between this amount and the sales allowance was due to cancellations in shipyard billings and to the use of actual American Bureau of Shipping survey fees in lieu of estimates.
In the case of the Bholes the sales allowance amounted to $37,206. On or about December 22,1948, Southeastern submitted proof to the Commission of the performance, and payment therefor, of the work on the Bholes for which an *621 allowance of $37,206 had been granted, and the Commission then credited Southeastern’s mortgage account on the SJioles in this amount.
60. On May 5,1948, H. B. White, Yice President of Southeastern, wrote the Commission protesting its refusal to grant a sales allowance on these two vessels covering fireproofing. As indicated, the Commission refused and continues to refuse to reduce the purchase price or otherwise to pay or allow credit for the cost of any of the work or incidental expenses in fireproofing the vessels. This work on each of the six vessels was performed and paid for by the plaintiffs.
61. The defendant has estimated the cost of performing the fireproofing work in 1941 and 1944. These estimates were calculated in the following manner:
(a) The cost of performing the fireproofing work on 22 of the 60 Liberty tank vessels in 1948 was averaged, the resulting figure being $45,000.
(b) The figure set forth in (a) was reduced by 20 percent to reflect the possible saving which would have resulted had the fireproofing work been performed during construction of the vessels, thus reducing the figure to $36,000.
(c) The amount of $36,000 was then adjusted in accordance with a composite shipyard cost study, the result being $23,400 as the cost of performing the work in 1944.
62. In arriving at the estimates for performing the work in 1941 and 1944, respectively, the defendant:
(a) Did not estimate the cost of performing each of the items of work necessary to comply with the March 4, 1948, release but instead took an average of the cost of 22 overall jobs performed in 1948.
(b) Used an arbitrary percentage to reflect the saving in cost which would have resulted had the items been installed at the time the vessel was constructed rather than substituted for existing items at a subsequent time.
(c) Did not give credit for the labor and materials expended in installing the items which were substituted for the fireproofing requirements in the original construction of the vessels, and no deduction was made for the cost of removing this existing material during the 1948 jobs.
*622 (d) Did not follow the method used by the Commission in obtaining the cost of desirable features. This method is set forth in a report approved by the Maritime Administrator on June 16, 1951, page 8, as follows:
Your Committee believes that this provision of the Act requires that the amount to be added to the statutory sales price unadjusted for a desirable feature is to be computed by estimating what it would have cost in 1941 to have included the feature in the vessel during its construction. This estimated amount would then be reduced to 50 per centum in the case of a dry-cargo vessel and 87;i/2 per centum in the case of a tanker. This procedure is followed with respect to all desirable features.
The report quoted above is referred to more fully in finding 67.
63. Lester Wells, a senior estimator in the Central Estimating Office of Todd Shipyard Company, made the original survey for Todd to determine the cost of bringing Liberty tankers into compliance with the fireproofing regulations shortly after the issuance of the March 4,1948, release of the Coast Guard. The survey and estimates made by Mr. Wells formed the basis for Todd’s bids and subsequent prices to the owners for fireproofing 11 Liberty-type tankers in its eastern yards. Included among these 11 vessels were the Pendleton and the Barnett, the two vessels owned by plaintiff Paco. On the basis of his original cost survey and the specifications for the work on the two Paco vessels, Mr. Wells prepared an estimate of the cost of complying with the fireproofing regulations had the work been done as part of the original construction of the vessels.
64. The cost of an original installation of marinite or fireproofing material in 1948 would have been $30,018, whereas the cost of an original installation of plywood in 1948 would have been $28,434. Both of these estimates are based upon an original construction job and eliminate the cost of removing existing bulkheads, fixtures, floor coverings, furniture, etc. The difference in the costs of the two installations is $1,584 and is primarily due to marinite’s being more ex *623 pensive than plywood. Actually, the difference in material cost is greater, but it is offset by the higher labor cost of installing plywood.
65. Todd Shipyard installed additional fire pumps outside of the engine room space, as required by the Coast Guard regulations, on the two Paco vessels. On the basis of this job and similar work, the only difference in cost between installing an additional fire pump in the after-pump room and installing it in the engine room, as was done on these Liberty tankers, would have been the cost of the additional piping required to be run aft to the pump room. The cost of such piping in 1948 was $712. The cargo valve reach rods on these vessels were originally installed more or less parallel to the shell of the vessel without any protective casing. The March 4, 1948, release of the Coast Guard required that the reach rods be brought to the deck through the companion trunks. On the basis of the work which was done on the two Paco vessels to bring this installation into compliance with Coast Guard regulations, the cost of installing the reach rods as required at the time the vessel was constructed would have been no greater than the cost of installing them as it actually was done during original construction. Under the Coast Guard release of March 4,1948, it was necessary to install bilge pump suctions in the pump rooms. The installation of these suctions during original construction would have been cheaper than installation at a later time. The cost of installation of these suctions during construction would have been $657 for each of the two pump rooms.
66. The difference in the cost of constructing a Liberty-type tanker in compliance with the regulations contained in the March 4, 1948, release of the Coast Guard and the cost of building the vessel as it was actually constructed would have been $3,610 in 1948. This difference in cost would have been $2,350 in 1941 on the basis of the curve of shipyard costs furnished by the Commission, marked as Plaintiffs’ Exhibit 140.
67. The evidence establishes that nine conversions to dry cargo vessels were made by purchasers of Liberty tankers *624 subsequent to transfer of title. Those vessels are not involved in this case. On the basis of the cost to purchasers of such conversion on three vessels at the eastern yards of Todd Shipyard Company, such cost to the Commission would have been from $170,000 to $180,000 per vessel.
68. The procedure possibly contemplated by the Ship Sales Act for determining desirable feature charges is contained in a recommendation dated June 12, 1951, addressed to the Deputy Maritime Administrator by a committee which studied the question pertaining to desirable features. The committee recommended the following procedure, approved by the Maritime Administrator on June 16,1951, upon which the plaintiffs herein rely:
1. Deduct from the unadjusted statutory sales price the amount estimated to put the vessel in class (Section 3 (d) (1)) other than allowances granted pursuant to P. L. 269, 80th Congress, and subsequent legislation.
2. Deduct the value of desirable features lacking (Section 3 (d) (2)).
3. Add the value of desirable features present (Section 3 (d) (3)).
4. Depreciate such results for the period from the date of original delivery of the vessel by its builder until the date of sale to the purchaser (Section 3 (d) (4))._
5. Deduct from the adjusted statutory sales price thus determined, any allowance granted pursuant to P. L. 269, 80th Congress, or subsequent legislation.
69. The computation under this formula, using both plaintiffs’ and defendant’s estimates, is as follows:

Plaintiffs’ Defendant’s estimate estimate

(1) The unadjusted statutory sales price of Liberty tankers as published in G. O. 60 (in this case there are no adjustments under item 1 in the preceding finding; likewise, no adjustments are necessary under item 2)__________________________$639, 000 $639,000
(2) Add the value of the alleged desirable feature, based on ¡50 percent of the prewar domestic cost of installing the feature---- 1,175 11,700
Total____________________________ 640,175 650,700

*625
Plaintiffs* Defendant’s estimate estimate

(3) Depreciate the total of (1) and (2) above for the period from the date of the original delivery of the vessel by its builder to the date of sale to the purchaser. These vessels were built in 1943 and sold in 1948, thus allow at least four years’ normal depreciation at 5 percent (no adjustment is made for war service depreciation in this tabulation, although at least 2 years of such depreciation is allowable in this case)____________________________$128,035 $130,140
512,140 520,560
70. Section 3 (d) (4) of the Ship Sales Act provides: “No adjustment * * * shall be made under this Act which will result in a statutory sales price which * * * in the case of any Liberty-type vessel will be less than 31% per centum of the domestic war cost of vessels of such type * * The floor price for Liberty-type vessels was set at $544,506 (General Order 60), and Paco and Southeastern paid this price for each of the vessels, as heretofore noted. Under the above computation, whether using plaintiffs’ or defendant’s estimates, any difference in statutory sales price resulting from the fireproofing work as a desirable feature is eliminated even if a finding had been made by the Commission or Administration that this was a desirable feature.
71. These cases are before the Court under Pule 38 (c) to determine the question of liability, the question of damages having been severed by agreement between the parties upon approval by the Commissioner.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover. The amount of damages will be determined after a further hearing before a Commissioner of the Court.

 Subchapter D, Rules Governing Tank Vessels (46 C. E. R. Part 30) was first approved and published in the Federal Register in November 1936.